## PUBLIC LIBRARY OF KENTUCKY *v.* A. W. LITTLE, ET AL.

**Legislative Grant to Public Library to Operate a Lottery.**

Courts have nothing to do with the policy of legislation, and where the general assembly passes an act to incorporate a public library and grants the right to operate a lottery in connection therewith to aid in raising money to maintain it, the courts are not to decide the wisdom of such legislation, but are only required to construe such legislation in accordance to the legislative intention.

APPEAL FROM LOUISVILLE CHANCERY COURT.

November 1, 1877.

OPINION BY JUDGE LINDSAY:

The act incorporating the public library of Kentucky authorized the corporation to acquire books, pamphlets, periodicals and papers to be used as a public library, and also to acquire and hold in fee simple, or otherwise, the necessary grounds and buildings in which to keep, preserve and use its library; and to enable it to obtain such books, grounds and buildings it was authorized to issue and sell stock, to accept presents, donations and gifts, to publish a newspaper, and also "to give, not exceeding five in number, public, literary, musicial or dramatic entertainments, at which they may distribute by lot to patrons of the entertainments a portion of the proceeds arising from the sale of tickets of admission."

The corporation was authorized to employ agents and assistants to collect books, pamphlets and newspapers, to secure subscriptions and donations, and to give and conduct literary, musical and dramatic entertainments for its benefits; but in such appointments and employments, the trustees were "not to involve the corporation in debts, nor incur for it any liability beyond its ready means of meeting them."

Pursuant to a contract entered into with the library company, Thomas G. Bramlette and his associates gave four musical entertainments, and distributed prizes to the holders of tickets, out of the money for which they had been sold.

These appellees formed a club and purchased five hundred dollars' worth of the tickets issued for the fifth and last entertainment. Prizes amounting to $104.50 were awarded and paid them. After all this they became convinced that the entertainment and the distribution of prizes were frauds on the act of incorporation, and they accordingly instituted this action in equity to recover from the public library the remainder of the $500 paid for tickets.

The gravamen of their complaint is that the library and Bramlette and his associates combined and confederated together to convert the distribution of prizes at the last four entertainments into gigantic lotteries, and that they were so converted against the spirit and intent of the legislative grant, and hence that said distributions of prizes were unauthorized and illegal.

The material facts stated in the petition, excluding all the irrelevant matter pleaded, support the averment that the distribution of prizes at the fifth and last entertainment was in the nature of a lottery, and if appellees are correct in their construction of the grant, it was manifestly in excess of the powers and privileges delegated to the corporations.

That the grant to the library was in the nature of a lottery privilege is perfectly clear, and when its object and purposes are considered it is difficult, if not impossible, to say that the legislature intended to limit the sale of tickets to the entertainments to persons who in good faith expected to attend them, and to prohibit the distribution of prizes to any other than such of the patrons as should actually be in attendance.

A great public library was to be established, which in the language of the act of incorporation is to be forever free to the gratuitous use and enjoyment of every citizen of the state of Kentucky, and of all good citizens of every state in the Union who shall comply with the rules and regulations made by the trustees.

The preamble to the act declares that many good citizens were anxious to contribute to such as public charity by gifts, loan and subscriptions, provided the legislature would grant such a charter as would inaugurate the enterprise and place it upon a permanent and self-sustaining basis.

Upon these considerations the charter was granted, and it pro-

vided no substantial and available means to raise the large fund necessary to inaugurate the movement and place the institution on a permanent and self-sustaining basis, and thus to encourage and induce persons interested in its success to make gifts, donations and subscriptions, except the privilege to distribute prizes by chance at the five entertainments it had the right to give. The authority to issue and sell bonds to an amount equal to one-half the capital stock subscribed for cannot be regarded as an available means for raising any considerable sum of money, as the stock could not exceed one hundred thousand dollars, and as a subscription for stock was in point of fact but an indirect mode of giving money to the corporation. The stock would not have been a desirable investment, without the lottery grant, as the act of incorporation was originally passed, and after the repeal of the ninth section of the act it was of no value even with that grant.

That the legislature intended to confer lottery privileges on the corporation does not admit of question. The grant is clear, explicit and unmistakable, and the sole inquiry presented by this case is whether the five distributions of prizes or gifts were to be proportioned to the purpose declared in the act, or committed or restricted by the inferences arising from the time, place and circumstances at and under which each distribution was to be made.

There is no express limitation in the grant as to the sums of money to be raised by the lottery privilege, nor as to the number or price of the tickets to be issued and sold for the several entertainments, nor as to the amounts to be distributed in the way of prizes. But it is insisted with much reason and great plausibility that there was an implied limitation as to each and all of these matters arising out of the facts that entertainments were to be given, that the prizes were to be made up alone out of portions of the proceeds of the sale of tickets of admission, and that they were to be awarded only to those who were the patrons of these entertainments. If this assumption be correct, then the library company were restricted, in the sales of tickets to each of their entertainments, to a number which would not preclude the probability of admitting each patron, and to a price not in excess of the highest prices for which tickets to such entertainments are sold, or had theretofore been sold.

The limitation or restriction to be thus attached to the grant would tend rather to defeat than to accomplish the purpose of the legislature, and this is a consideration not to be lost sight of.

An exceptional right like that of a lottery privilege will never be

raised by implication or construction, but when, as in this case, the grant is expressly made, it becomes a delicate matter for the courts to imply limitations, not in terms expressed by the legislature, in order to protect the public morals or prevent the grantee from reaping the benefit of a fraud supposed to have been practised on the lawmakers.

It is the duty of the courts to ascertain, if possible, the legislative will, and to uphold and enforce it, inside of constitutional limitations, without regard to the policy of the legislation or the motives or the legislators.

It may be proper in construing an act of the legislature to look to the effects and consequences when its provisions are ambiguous or the legislative intention is doubtful. But when the law is clear and explicit, and its provisions are susceptible of but one interpretation, its consequences of evil can only be avoided by a change of the law itself, to be affected by legislative and not judicial action. *Bosley v. Mattingly,* 14 B. Mon. 89.

The effect and consequences of this lottery grant were undoubtedly to promote the spirit of gaming and thus to debauch the public morals. But the grant being clear and unmistakable, the duty resting on the judiciary is to determine whether the legislature intended the privilege to be exercised within certain implied limitations, or to be operated upon a scale sufficiently extended to secure the establishment of the free library on a permanent and self-sustaining basis.

In this view the difference as to the questions of morals and public policy is in degree and not in the principle.

After there had been one entertainment given and one distribution of prizes made, and the public fully informed as to the construction claimed for the grant by the corporation, the attention of the legislature was called to the supposed abuse of the privilege and it was asked to revoke it. This it declined to do; but it did so amend the charter as to deprive the stockholders of the right to distribute to themselves the remainder of the property on hand, in case the library should at any time be discontinued, and the books, periodicals, papers and pamphlets given, donated and loaned, restored to the persons from whom they were received.

This action on the part of the legislature is not to be regarded as even an authoritative legislative exposition of the lottery grant; but as it is part of the history of the legislation on the subject, it may be referred to and considered in reaching its true construction.

*Henry v. Tilson,* 17 Vermont 479; Sedgwick on Constitutional and Statutory Law, page 252.

The several means provided by the legislature to establish the full library on a self-sustaining basis were subscriptions for stock, gifts, donations, bequests and loans, the right to publish a newspaper, and the privilege of raising money by way of lottery.

The mere recapitulation of these means shows that the one most likely to render certain the success of the enterprise was the lottery grant. It would seem, therefore, that to restrict that grant or privilege within the circumscribed compass contended for by appellees' counsel would be to hold that because the legislature provided that entertainments should be given, and the prizes to be distributed made up out of the proceeds of the tickets sold to the patrons of such entertainments, it therefore intended to render this most important means practically of but little value.

The object and intention of the legislature was not only plainly manifested by the general provisions of the act, but are expressly declared by the preamble, and the means devised to secure the success of the public charity cannot be impaired by judicial construction, however objectionable they may be. The responsibility for the evils resulting from legislation like this rests with the law-makers and not with the courts, and it is neither their duty nor their right to undertake to correct or limit such evils by encroaching on the exclusive domain of legislative power.

The lottery grant is not void by reason of the provisions of Sec. 37, Art. 2, of the state constitution. It is legitimate, although it may be an objectionable mode by which to raise the funds necessary to establish the free library. The rule is "that none of the provisions of a statute should be regarded as unconstitutional when they all relate directly or indirectly to the same subject, have a natural connection, and are not foreign to the subject expressed in the title." *Phillips v. Covington & Cincinnati Bridge Company,* 2 Met. 219; *Louisville & Oldham Turnpike Road Company v. Ballard,* 2 Met. 165; *McReynolds v. Smallhouse,* 8 Bush 447.

In view of these conclusions we cannot decide that the fifth and last drawing or distribution of prizes by the library and its agents was unauthorized or illegal. We need not determine whether the contract between the library and Bramlette, etc., was or not judicious and proper, nor whether the trustees have misapplied or misappropriated the profits arising out of the exercise of the lottery grant. These are matters in which these appellees have no interest.

Judgment *reversed* and cause remanded with instructions to sustain appellant's demurrer.

Judge Cofer concurs in the reversal of the judgment, but does not concur in the reasoning of this opinion.

*Harlan & Wilson, N. J. Cardwell, Duke & Richards, W. P. D. Bush, for appellant.*

*D. W. Armstrong, B. Duncan, L. H. Dembitz, for appellees.*